**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

| | | |
|---|---|---|
| **CENTER FOR SCIENCE IN THE PUBLIC INTEREST**, *et al.*, | * | |
| | * | |
| **Plaintiffs,** | | |
| v. | * | **Case No.: GJH-19-1004** |
| **SONNY PERDUE**, *et al.*, | * | |
| **Defendants.** | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION

Plaintiffs Center for Science in the Public Interest and Chesapeake Institute for Local Sustainable Food & Agriculture, d/b/a Healthy School Food Maryland (collectively, "Plaintiffs") have brought this action pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, *et seq.*, challenging a final rule promulgated by Defendant United States Department of Agriculture ("USDA") governing nutrition standards for school breakfast and lunch programs.[1] ECF No. 1. Pending before the Court are the parties' Cross-Motions for Summary Judgment. ECF Nos. 26, 28.[2] No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2016). For the following

---

[1] In addition to USDA, Plaintiffs are suing the Food and Nutrition Service ("FNS"), United States Secretary of Agriculture Sonny Perdue, and FNS Administrator Brandon Lipps. The allegations against the four defendants are the same, so the Court will refer to them collectively as "USDA."

[2] There are several additional motions pending before the Court. First, the following groups have filed four separate Motions for Leave to File an Amicus Brief: the School Nutrition Association ("SNA"), ECF No. 33; the Physicians Committee for Responsible Medicine ("Physicians Committee"), ECF No. 35; the States of Nebraska, Alabama, Indiana, Kansas, Louisiana, Oklahoma, Texas, and Utah ("the States"), ECF No. 40; and the American Heart Association, the American Public Health Association, FoodCorps, Inc, MomsRising Education Fund, and the National Education Association ("the AHA Group"), ECF Nos. 41, 48. No parties have filed an opposition to any of these Motions, and the States' Motion and the AHA Group's Motion explicitly indicate that they are unopposed, so the Court will grant all four Motions for Leave to File an Amicus Brief. Second, Plaintiffs' former counsel, Josephine Morse, has filed a Notice of Withdrawal. ECF No. 17. The Notice was docketed as a Motion to Withdraw as Attorney, so the Court will grant the Motion.

reasons, Plaintiffs' Cross-Motion for Summary Judgment is granted, and USDA's Cross-Motion for Summary Judgment is denied.

## I.    BACKGROUND

### A.  School Lunch and Breakfast Programs

Over fifty years ago, Congress created the National School Lunch Program ("NSLP") and the School Breakfast Program ("SBP") "to safeguard the health and well-being of the Nation's children and to encourage the domestic consumption of nutritious agricultural commodities and other food." 42 U.S.C. §§ 1751, 1771. Congress charged the Secretary of Agriculture with implementing the school lunch and breakfast programs, *id.* § 1752, and required USDA to provide technical assistance and training to help states and schools comply with school meal standards under these programs, *id.* §§ 1758(a)(1)(B), (k)(1)(B).

Schools participating in the NSLP and SBP are required to serve meals that "are consistent with the goals of the most recent Dietary Guidelines for Americans [("Dietary Guidelines")]." *Id.* § 1758(f)(1)(A). Congress has specifically directed USDA to "promulgate rules, based on the most recent Dietary Guidelines [], that reflect specific recommendations, expressed in serving recommendations, for increased consumption of foods and food ingredients offered in school nutrition programs," *id.* § 1758(a)(4)(B), and to "promulgate proposed regulations to update the meal patterns and nutrition standards for the [school lunch and breakfast programs] … based on recommendations made by the Food and Nutrition Board of the National Research Council of the National Academy of Sciences" in the "School Meals: Building Blocks for Healthy Children" Report ("School Meals Report"), *id.* § 1753(b)(3)(A)(i). The Dietary Guidelines is a statutorily mandated report, jointly issued every five years by USDA and the Department of Health and Human Services, that "contain[s] nutritional and dietary

information and guidelines for the general public, and shall be promoted by each Federal agency in carrying out any Federal food, nutrition, or health program." 7 U.S.C. § 5341(a)(1). The School Meals Report, published in 2010 by the Institute of Medicine's Committee on Nutrition Standards for National School Lunch and Breakfast Programs (the "Committee"), was commissioned by USDA to provide recommendations for the revision of "the nutrition- and food-related standards and requirements for the [school lunch and breakfast programs]." AR 7909.[3] Specifically, the Committee "was asked to review and assess the food and nutritional needs of school-aged children in the United States using the 2005 [Dietary Guidelines] and the [Institute of Medicine]'s Dietary Reference Intakes (DRIs) and to use that review as a basis for recommended revisions to the [school lunch and breakfast programs'] Nutrition Standards and Meal Requirements." *Id.*

Relevant to this case, the School Meals Report recommended a gradual approach to improving the sodium and whole grain content in school meals. AR 8087. For sodium, the School Meals Report recommended a maximum sodium intake based on age group and meal— between 430 mg and 470 mg for breakfast and between 640 mg and 740 mg for lunch—and recommended that USDA set intermediate targets for maximum sodium intake over a ten-year period. AR 8103–6. For whole grains, the School Meals Report recommended incremental increases in the minimum percentage of grains that are required to be whole grain-rich so that the proportion of whole grain-rich foods in school meals would exceed fifty percent within three years. AR 8106.

---

[3] "AR" refers to the Administrative Record, filed by USDA on June 27, 2019. *See* ECF No. 22. The pin cites refer to the page numbers generated by USDA's Bates numbering system.

### B.  The 2012 Rule

On January 26, 2012, after a notice and comment period, USDA promulgated a final rule, *Nutrition Standards in the National School Lunch and School Breakfast Programs*, 77 Fed. Reg. 4088 (Jan. 26, 2012) ("2012 Rule"), that "align[ed]" the school lunch and breakfast programs' nutrition standards with the Dietary Guidelines and was "largely based" on the School Meals Report. AR 3042. For sodium, the 2012 Rule established a ten-year, three-phased schedule for reducing sodium levels based on age group and meal. By School Year ("SY") 2014–2015, schools were required to reduce sodium levels to between 540 mg and 640 mg for breakfast and between 1230 mg and 1460 mg for lunch ("Sodium Target 1"); by SY 2017–2018, to between 485 mg and 570 mg for breakfast and 935 mg and 1080 mg for lunch ("Sodium Target 2"); and, finally, by SY 2022–2023, to between 430 mg and 500 mg for breakfast and 640 mg and 740 mg for lunch ("Final Sodium Target"). AR 3051. USDA explained that "[m]eeting the final sodium targets will enable schools to offer meals that reflect the 2010 Dietary Guidelines' recommendation to limit sodium intake to less than 2,300 mg per day." *Id.* USDA also explained that a phased schedule "lengthening the transition to lower sodium foods" would "respond to the challenge of meeting those targets" by providing more time to facilitate student acceptance and for the industry to develop products that meet the rule's standards. AR 3080.

For whole grains, the 2012 Rule required that fifty percent of all grain products offered in school meals be whole grain-rich during SY 2013–2014, and for SY 2014–2015 and beyond, it required that one-hundred percent of grain products be whole grain-rich. AR 3076. USDA explained that this approach matched the 2005 Dietary Guidelines recommendation that at least half of all grains be whole grains. AR 4093–94.

In response to the 2012 Rule, Congress enacted a series of appropriations riders that

directed USDA to retain Sodium Target 1 through SY 2017–2018 and allowed states to grant

exemptions from the one-hundred percent whole grain-rich requirement for school food

authorities ("SFAs")[4] that "demonstrate[d] hardship, including financial hardship, in procuring

specific whole grain products which are acceptable to the students and compliant with the whole

grain rich requirements," so long as the SFAs still met the fifty-percent whole grain requirement.

*See* AR 80 (2011 Rider); AR 244 (2014 Rider); AR 943 (2015 Rider); AR 1833 (2017 Rider).

The last rider was set to expire after SY 2017–2018. AR 1833.

### C.  The 2018 Rule

On November 30, 2017, USDA published an Interim Final Rule[5] extending the sodium

and whole grain "flexibilities" for the school meal programs. AR 1–21; *see also Child Nutrition*

*Programs: Flexibilities for Milk, Whole Grains, and Sodium Requirements*, 82 Fed. Reg. 56,703

(Nov. 30, 2017). With respect to sodium, the Interim Final Rule acknowledged "the importance

of reducing the sodium content of school meals," and it stated that "reaching this objective will

likely require a more gradual process than the planned 10 years to accommodate the individual

challenges of SFAs and their access to new products lower in sodium." AR 6. The Interim Final

Rule would thus "retain Sodium Target 1 as the regulatory limit in the NSLP and SBP through

the end of the SY 2018–2019," with the high probability that Sodium Target 1 would remain in

effect "through at least the end of SY 2020–2021 to provide SFAs more time to procure and

introduce lower sodium food products, allow food industry more time for product development

---

[4] A "school food authority" is "[t]he governing body that is responsible for the administration of one or more schools and that has the legal authority to operate the school meal programs therein or that is otherwise approved by the [FNS] of the [USDA] to operate the school meal programs." AR 8133.
[5] Pursuant to 5 U.S.C. § 553(b)(B), USDA issued this rule as an interim final rule, as opposed to a notice of a proposed rule. AR 7. It found "for good cause that, in this limited instance, use of prior notice and comment procedures for issuing this time-limited interim final rule [was] impracticable." *Id.* USDA requested public comments to inform the agency's development of a final rule. *See, e.g.*, AR 1.

reformulation, and give students more time to adjust to school meals with lower sodium content." AR 2. USDA sought "public comments on the long-term availability of this flexibility and its impact on the sodium reduction timeline established in 2012 and, specifically, the impact on Sodium Target 2." *Id.*

With respect to whole grains, the Interim Final Rule "retain[ed] the whole grain-rich regulatory requirement" of one-hundred percent whole grain-rich foods, AR 6, but it allowed state agencies to continue granting exemptions to SFAs that could "demonstrate hardship(s) in procuring, preparing, or serving specific products that are acceptable to students and compliant with the whole grain-rich requirement." AR 2. USDA explained that the exemption option would allow "SFAs experiencing challenges to more effectively develop menus and procure foods that are acceptable to students[;] provide[] manufacturers additional time to develop whole grain-rich food products that are suitable for reheating and hot holding in the food service facility and result in more acceptable meals for students[; and] assist schools in sustaining student participation, encouraging meal consumption, and limiting food waste." AR 6.

Finally, with respect to both sodium and whole grains, USDA anticipated that, "[i]n the future, USDA [would] also reevaluate the sodium and other school meal requirements in light of the 2020 Dietary Guidelines." AR 7; *see also* AR 2 ("Also, USDA anticipates that the sodium requirement will continue to be reevaluated for consistency with the Dietary Guidelines, which are updated every five years, and in response to Congressional action, as appropriate.").

On December 12, 2018, the USDA issued a Final Rule, *Child Nutrition Programs: Flexibilities for Milk, Whole Grains, and Sodium Requirements*, 83 Fed. Reg. 63,775 (Dec. 12, 2018). *See* AR 22–41. The Final Rule retained Sodium Target 1 through the end of SY 2023–2024, at which point school meals would be required to comply with Sodium Target 2, and it

eliminated the Final Sodium Target altogether. AR 29. The Final Rule explained that the new targets "balance[d] the need for strong nutrition standards with the operational concerns and student acceptance of school meals" by allowing schools "to slowly introduce lower sodium foods to students and for industry to develop consistent lower sodium products that are palatable for students." AR 34.

The Final Rule also eliminated the one-hundred percent whole grain-rich requirement, and it required that only half of the weekly grains offered in school meals meet the whole grain-rich requirement, thus "remov[ing] the need for whole-grain rich exemption requests based on hardship." AR 28. The Final Rule explained that granting hardship exemptions "in an ad hoc fashion" was "not feasible," AR 28, and that the decision to reduce the whole grain requirement "was made to reduce Program operator burden while still providing children access to whole grain-rich items," AR 33.

### D.  Procedural Background

On April 3, 2019, Plaintiffs filed a Complaint for Declaratory and Injunctive Relief in this Court challenging the Final Rule as unlawful under the APA. ECF No. 1. On August 2, 2019, Plaintiffs filed their Motion for Summary Judgment. ECF No. 26. USDA filed its response to Plaintiffs' Motion, ECF No. 27, and its Cross-Motion for Summary Judgment, ECF No. 28, on August 30, 2019. Plaintiffs filed a consolidated reply in support of their Cross-Motion for Summary Judgment and opposition to USDA's Cross-Motion for Summary Judgment on October 11, 2019. ECF No. 52. USDA filed its reply in support of its Cross-Motion for Summary Judgment on November 6, 2019. ECF No. 56.

## II.     STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate when the

pleadings and the evidence demonstrate that "there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law." In a case involving review of a final

agency action under the APA, however, the standard set forth in Rule 56(a) does not apply

because of the limited role of a court in reviewing the administrative record. *See Otsuka Pharm.*

*Co. v. Burwell*, No. GJH-15-852, 2015 WL 3442013, at *5 (citing *Roberts v. United States*, 883

F. Supp. 2d 56, 62–63 (D.D.C. 2012)). Summary judgment thus serves as a mechanism for

deciding, as a matter of law, whether the agency action is supported by the administrative record

and is otherwise consistent with the APA standard of review. *See id.* (citing *Richard v. INS*, 554

F.2d 1173, 1177, 1177 n. 28 (D.C. Cir. 1977)). "[T]he function of the district court is to

determine whether or not as a matter of law the evidence in the administrative record permitted

the agency to make the decision it did." *Air Transp. Ass'n of Am. v. U.S. Dep't of Agric.*, 303 F.

Supp. 3d 28, 38 (D.D.C. 2018) (quoting *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C.

2006)).

Under the APA, the Court shall "hold unlawful and set aside agency action, findings and

conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law." 5 U.S.C. § 706(2)(A). "A disputed action also may be set aside as

arbitrary and capricious if the agency has acted 'without observance of procedure required by

law.'" *Safari Club Int'l v. Zinke*, 878 F.3d 316, 325 (D.C. Cir. 2017) (quoting 5 U.S.C. §

706(2)(D)). "Generally, an agency decision is arbitrary and capricious if 'the agency has relied

on factors which Congress has not intended it to consider, entirely failed to consider an important

aspect of the problem, offered an explanation for its decision that runs counter to the evidence

before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 293 (4th Cir. 2018) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). "Review under this standard is highly deferential, with a presumption in favor of finding the agency action valid." *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009). "Although [the court's] inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Id.* (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971))). "Deference is due where the agency has examined the relevant data and provided an explanation of its decision that includes 'a rational connection between the facts found and the choice made.'" *Id.* (quoting *State Farm*, 463 U.S. at 43). Courts "should 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Sanitary Bd. of City of Charleston v. Wheeler*, 918 F.3d 324, 333 (4th Cir. 2019) (quoting *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658 (2007)). Courts "will vacate agency action if it is not 'based on a consideration of the relevant factors' or where 'there has been a clear error of judgment.'" *Defs. of Wildlife v. U.S. Dep't of the Interior*, 931 F.3d 339, 345 (4th Cir. 2019) (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989)).

## III.   DISCUSSION

Plaintiffs contend that the Final Rule violates the APA because it is inconsistent with the federal statutes governing the school meal programs, it reflects unexplained and arbitrary decisionmaking, it represents an unacknowledged and unexplained changed in position, it is not a logical outgrowth of the Interim Final Rule, and USDA failed to appropriately respond to public comments. After reviewing the administrative record, the Court concludes that the Final

9

Rule is not inconsistent with federal law, it does not reflect unexplained and arbitrary decisionmaking, it does not represent an unacknowledged and unexplained change in position, and the USDA appropriately responded to public comments. The Court does find, however, that the Final Rule is not a logical outgrowth of the Interim Final Rule, so it must be vacated and remanded to the administrative agency for further proceedings.

### A.  Logical Outgrowth

Plaintiffs contend that the Final Rule is not a logical outgrowth of the Interim Final Rule. "The requirement of notice and a fair opportunity to be heard is basic to administrative law." *Chocolate Mfrs. Ass'n of U.S. v. Block*, 755 F.2d 1098, 1102 (4th Cir. 1985). Notice must be "sufficiently descriptive to provide interested parties with a fair opportunity to comment and to participate in the rulemaking," but an agency "is not required to specify every precise proposal that it may eventually adopt as a rule." *Kennecott v. EPA*, 780 F.2d 445, 452 (4th Cir. 1985) (internal quotation marks omitted). The purpose of this procedure "is both to allow the agency to benefit from the experience and input of the parties who file comments … and to see to it that the agency maintains a flexible and open-minded attitude towards its own rules." *Chocolate Mfrs. Ass'n*, 755 F.2d at 1103 (internal quotation marks omitted).

Under the APA, an agency is permitted to revise a final rule after initial notice of the proposed rule "if the changes in the original plan 'are in character with the original scheme,' and the final rule is a 'logical outgrowth' of the notice and comments already given." *Id.* at 1105 (quoting *BASF Wyandotte Corp. v. Costle*, 598 F.2d 637, 642 (1st Cir. 1979)). The proposed rule must enable the public "to discern what [is] at stake." *Manufactured Hous. Inst. v. EPA*, 467 F.3d 391, 400 (4th Cir. 2006). But "if the final rule 'substantially departs from the terms or substance

of the proposed rule,' the notice is inadequate." *Chocolate Mfrs. Ass'n*, 755 F.2d at 1105

(quoting *Rowell v. Andrus*, 631 F.2d 699, 702 n.2 (10th Cir. 1980)).

Here, the Final Rule is not a logical outgrowth of the Interim Final Rule.[6] With respect to

sodium, the Interim Final Rule acknowledged "the importance of reducing the sodium content of

school meals" because over ninety percent of school-age children exceeded the Dietary

Guidelines' upper intake limit for dietary sodium between 2009 and 2012. AR 6. At the same

time, it recognized that "a more gradual process" was necessary to meet this goal. *Id.* The

purpose of the Interim Final Rule was therefore to provide "more time" for children to adjust to

school meals with less sodium content and for schools and manufacturers to make appropriate

menu and product changes, AR 7, thus suggesting that the Dietary Guidelines' upper intake

limit, long-embodied in the Final Sodium Target, would remain in effect, but would simply be

delayed. Indeed, the Interim Final Rule spoke exclusively in terms of delaying compliance

requirements, not abandoning the compliance requirements altogether, and at no point did the

Interim Final Rule discuss eliminating the Final Sodium Target or even solicit comments about

the effect of continued sodium "flexibilities" on the Final Sodium Target. Rather, it

"specifically" sought comment only on "the impact [of extending the Sodium Target 1

compliance dates] on Sodium Target 2." AR 2. "This specificity, together with total silence

concerning any suggestion of eliminating [the Final Sodium Target], strongly indicated that [the

Final Sodium Target] was not at issue." *See Chocolate Mfrs. Ass'n*, 755 F.2d at 1107 (finding

that a final rule eliminating flavored milk from a permissible diet was not a logical outgrowth of

a proposed rule that specifically discussed the dangers of high sugar content in foods such as

---

[6] Neither party has suggested that the logical outgrowth doctrine does not apply to interim final rules, and the Court
has not located any such authority. Thus, the Court will apply the logical outgrowth doctrine to the Interim Final
Rule as if it were a proposed rule.

cereals and juices, but not flavored milk, which had long been considered part of a permissible diet).

Although an agency is certainly permitted to change a rule in response to comments, USDA's changes are not "in character with the original scheme" of the Interim Final Rule, *see id.* at 1105, because there is a fundamental difference between delaying compliance standards—which indicates that school meals will still eventually meet those standards—and eliminating those standards altogether, *cf. Wagner Elec. Corp. v. Volpe*, 466 F.2d 1013, 1019–20 (3d Cir. 1972) (concluding that a final rule *altering* performance criteria for hazard warning flashers was not in character with *eliminating* the permissible failure rate for flashers). Thus, the Final Rule's elimination of the Final Sodium Target is not a logical outgrowth of the Interim Final Rule's focus on delaying compliance requirements.

The Final Rule's elimination of the one-hundred percent whole grain-rich requirement is similarly not a logical outgrowth of the Interim Final Rule. With respect to whole grains, the Interim Final Rule specifically "retain[ed] the whole grain-rich regulatory requirement" of one-hundred percent whole grains, while also extending the availability of an exemption, upon request, to "SFAs that demonstrate hardship in providing specific products that meet the whole grain-rich criteria and as long as at least 50 percent of the grains served are whole grain-rich." AR 6. The express purpose of extending the exemption's availability was, as with sodium, to provide "additional time" for students, schools, and the industry to adjust. AR 6.

Congress' regular appropriations riders offering the hardship exemption, in conjunction with the Interim Final Rule's "very detailed" discussion of that exemption and its "total silence concerning" eliminating, or even changing, the underlying one-hundred percent whole-grain rich requirement, "could have led interested persons only to conclude that a change in [the underlying

12

whole-grain rich requirement] would not be considered." *See Chocolate Mfrs.*, 755 F.2d at 1107.

The Final Rule therefore "materially alter[ed]" and "substantially depart[ed] from the terms or

substance" of the Interim Final Rule by transforming what was a limited, case-by-case

exemption into the new rule across the board. *See id.* at 1105. Thus, the Final Rule's elimination

of the one-hundred percent whole grain-rich requirement is not a logical outgrowth of the Interim

Final Rule.[7]

       USDA argues that because it received comments related to the complained-of changes to

sodium and whole grain requirements, the Interim Final Rule must have provided sufficient

notice of those changes. This argument is unpersuasive. There is no authority to support the

proposition that the presence of comments addressing a particular topic is sufficient, on its own,

to establish proper notice; rather, the proposed rule itself still "must fairly apprise interested

parties of the potential scope and substance of a substantially revised final rule." *Chocolate Mfrs.

Ass'n*, 755 F.2d at 1105; *see also Fertilizer Instit. v. EPA*, 935 F.2d 1303, 1312 (D.C. Cir. 1991)

(stating that an agency itself must provide notice of a rule change and finding that comments

suggesting the rule change were of "little significance" because "[c]ommenting parties cannot be

expected to monitor all other comments submitted to an agency" and the agency "cannot

bootstrap notice from a comment").

       The cases cited by USDA in support of its argument suggest, at most, that where a

proposed rule expressly solicits comments on a particular topic or implies the possibility of a

particular change, the presence of related comments further supports the sufficiency of the

---

[7] The Interim Final Rule's statement that USDA would "reevaluate the sodium and other school meal requirements in light of the 2020 Dietary Guidelines," *see* AR 7, does not make the Final Rule a logical outgrowth of the Interim Final Rule. The 2020 Guidelines are yet to be released, and even if those Guidelines do ultimately necessitate elimination of the Final Sodium Target or the one-hundred percent whole-grain rich requirements, those Guidelines could not provide any notice to the commenters of USDA's intention to eliminate those requirements. Again, at most, this reference to the future 2020 Guidelines foreshadowed a delay in compliance with the sodium targets or a continuation of the whole grain hardship exemption, not elimination altogether.

notice. *See, e.g., Appalachian Power Co. v. EPA*, 135 F.3d 791, 816 (D.C. Cir. 1998) (finding

that a final rule using two specific emission control technologies as the basis for the emission

limit for wet bottom broilers was a logical outgrowth of the proposed rule because "the agency's

proposed rule did solicit comments regarding the use of both technologies in such broilers" *and*

"[c]ommenters clearly understood that these technologies were under consideration, as the

agency received comments on them from several sources" (emphasis added)); *Mkt. Synergy*

*Grp., Inc. v. U.S. Dep't of Labor*, No. 16–CV–4083–DDC–KGS, 2016 WL 6948061, at *17–18

(D. Kan. Nov. 28, 2016) (finding that where the proposed rule provided notice of the

complained-of change, the existence of comments related to that change "provide[d] additional

support for the conclusion that the final rule was a logical outgrowth of the proposed rule").[8]

For example, USDA cites to *Northeast Maryland Waste Disposal Auth. v. EPA*, 358 F.3d

936 (D.C. Cir. 2004). In that case, the D.C. Circuit determined that a proposed rule

distinguishing between three categories of municipal waste combustor ("MWC") units—

nonrefractory MWCs located at plants with aggregate capacities of more than 250 tons per day

("tpd"), refractory MWCs located at plants with aggregate capacities of more than 250 tpd, and

all MWCs located at plants with aggregate capacities equal to or less than 250 tpd—provided

sufficient notice of a final rule that merged the refractory and nonrefractory categories and

distinguished only based on aggregate capacity. *Id.* at 952. The court stated that "[b]y

announcing that it proposed to distinguish between refractory and nonrefractory units, EPA

invited comments on both the pros and cons of that distinction. It thus effectively served notice

---

[8] In its reply brief, USDA also cites to *Teledyne, Inc. v. United States*, 50 Fed. Cl. 155 (2001). ECF No. 56 at 23. This case evaluates the notice requirement under the Office of Federal Procurement Policy Act, not the APA. *See Teledyne*, 50 Fed. Cl. at 188–89. Moreover, to support its argument, the USDA appears to cite to a portion of the opinion outlining the agency's arguments in that case, *not* the court's conclusions. *Id.* The court's conclusions in that case simply stated that the agency did not commit any procedural errors and complied with the necessary notice and comment requirements. *Id.* at 190. The opinion contained no discussion of whether the existence of comments on the complained-of aspect of the rule actually factored into the court's analysis. *Id.*

that, if persuaded that the latter outweighed the former, the distinction might not survive. Nor did the interested parties misread either the invitation or the stakes involved" because "[n]umerous commentators … filed comments that were critical of the distinction between refractory and nonrefractory units." *Id.* A clear reading of this case establishes that the mere existence of relevant comments was not the deciding factor in the D.C Circuit's determination that notice was sufficient; rather, the presence of the proposed rule's invitation to comment on the distinction was significant, with the presence of relevant comments merely providing additional support. Here, in contrast, the Interim Final Rule's invitation to comment extended only to whether USDA should retain or eliminate the sodium and whole grain flexibilities. There was no express or implicit invitation to comment on eliminating any standards altogether, making the presence of related comments insignificant to the Court's determination here.

Because the Interim Final Rule "gave no indication that the agency was considering a different approach [from delaying compliance with Sodium Target 1 or offering a hardship exemption to the whole grain requirement], and the final rule revealed that the agency had completely changed its position," the Interim Final Notice did not provide sufficient notice of the Final Rule. *See CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1081 (D.C. Cir. 2009). The Final Rule therefore violates the APA and will be vacated and remanded to the administrative agency for further proceedings. *See Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110–11 (D.C. Cir. 2014) (stating that "deficient notice is a fundamental flaw that almost always requires vacatur," especially where it is not "too late to reverse course"); *AFL-CIO v. Chao*, 496 F. Supp. 2d 76, 91 (D.D.C. 2007) (stating that "failure to comply with the APA's notice-and-comment requirements is unquestionably a 'serious' deficiency" in the rulemaking process that justifies vacatur).

15

**B.  Other Proposed Grounds for Vacatur and Remand**

Plaintiffs also contend that the Final Rule violates the APA because it is inconsistent with federal law, it reflects unexplained and arbitrary decisionmaking, it represents an unacknowledged and unexplained changed in position, and USDA failed to appropriately respond to public comments. The Court determines that these are not additional grounds for vacating and remanding the Final Rule, but will still address each ground separately.

**i.  Consistency with Federal Law**

Plaintiffs contend that the Final Rule is inconsistent with federal law, and therefore violates the APA, because it fails to require the nutrition standards for schools meals to closely align with the Dietary Guidelines.

Because USDA is charged with administering the school lunch and breakfast programs, *see* 42 U.S.C. §§ 1752, 1758(a)(1)(B), (k)(1)(B), the Court will review its construction of these statutes under the familiar two-step process of *Chevron, U.S.A., Inc. v. Nat'l Res. Def. Council, Inc.*, 467 U.S. 837 (1984), commonly referred to as the *Chevron* deference doctrine. This is so because courts have "long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations has been consistently followed … whenever decision as to the meaning or reach of a statute has involved reconciling conflicting policies, and a full understanding of the force of the statutory policy in the given situation has depended upon more than ordinary knowledge respecting the matters subjected to agency regulations." 467 U.S. at 844 (citing cases).

Under the *Chevron* analysis, "[f]irst, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end

of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843–44.

Under the first step of *Chevron*, "a reviewing court is to 'employ [] traditional tools of statutory construction' to determine whether Congress addressed 'the precise question at issue.'" *Nat'l Elec. Mfrs. Ass'n v. U.S. Dep't of Energy*, 654 F.3d 496, 504 (4th Cir. 2011) (quoting *Chevron*, 467 U.S. at 842, 843 n.9). Courts begin this analysis with the text and structure of the statute. *Id.* (citing *Cabell Huntington Hosp. Inc. v. Shalala*, 101 F.3d 984, 986 (4th Cir. 1996)). After all, "the plain language of the statute" is "the most reliable indicator of Congressional intent." *Schafer v. Astrue*, 641 F.3d 49, 54 (4th Cir. 2011) (internal quotation marks omitted). Additionally, the Fourth Circuit has "described legislative history as one of the traditional tools of interpretation to be consulted at *Chevron*'s step one." *Nat'l Elec. Mfrs. Ass'n*, 654 F.3d at 504–5 (citing *Elm Grove Coal Co. v. Dir., O.W.C.P.*, 480 F.3d 278, 293–94 (4th Cir. 2007)).

Here, the relevant statutory provisions require that schools serve meals that "are consistent with the goals of the most recent" Dietary Guidelines, 42 U.S.C. § 1758(f)(1)(A), and that USDA "promulgate rules, based on the most recent Dietary Guidelines [], that reflect specific recommendations, expressed in serving recommendations, for increased consumption of foods and food ingredients offered in school nutrition programs," *id.* § 1758(a)(4)(B), and "promulgate proposed regulations to update the meal patterns and nutrition standards for the [school lunch and breakfast programs] … based on recommendations" in the School Meals

Report, *id.* § 1753(b)(3)(A)(i). Plaintiffs contend that this language requires schools to serve meals that conform to the Dietary Guidelines' specific quantitative objectives for whole grains and sodium and directs USDA to promulgate nutrition standards that closely align with the requirements in those Guidelines. In contrast, USDA contends that there need not be as close a relationship between its rules and the Dietary Guidelines as Plaintiffs suggest and that it is only required to take the Dietary Guidelines into account, rather than adopt them as the only permissible standard.

The Court concludes that the relevant federal statutes do not unambiguously support either party's suggested interpretation. Beginning with the text and structure of the relevant statutes, Congress' requirement that school meals be "consistent with the goals of" the Dietary Guidelines is vague and general. First, although "goal" is easily definable as the "object" or "end" to which an effort or endeavor is directed, *see, e.g.*, *Webster's New World Coll. Dictionary* (5th ed. 2014); *Merriam-Webster's Coll. Dictionary* (11th ed. 2009); *Am. Heritage Dictionary of the English Language* (5th ed. 2015), this term could refer to different objectives within the context of the Dietary Guidelines. Specifically, "goals" could refer to the specific quantitative recommendations to which Plaintiffs point, or it could refer to the more general goals of increasing whole grain consumption and reducing sodium consumption to which USDA points. Congress did not clearly indicate which "goals" it was referring to in crafting its directive.

Nor did Congress clearly define what it meant by requiring that school meals be "consistent with" those goals. This language could, as Plaintiffs contend, require that schools serve meals "compatible [with], or conforming to" the Dietary Guidelines, *see Orthopaedic Hosp. v. Belshe*, 103 F.3d 1491, 1496 (9th Cir. 1997), or, as USDA contends, it could grant the agency with broad discretion to determine the appropriate degree of consistency between school

meal standards and the Dietary Guidelines, *see Tackitt v. Prudential Ins. Co. of Am.*, 758 F.2d

1572, 1575 (11th Cir. 1985) (characterizing the requirement that the Office of Personnel

Management "act in a manner consistent with the goals and policies" of a program as a "very

broad" grant of authority).

Similarly, the statutes do not clearly define what Congress meant by requiring USDA

rules and regulations to be "based on" the Dietary Guidelines and the School Meals Report. It is

plausible that this means that USDA's rules and regulations must be "substantially similar" to the

Dietary Guidelines and School Meals Report, *see Leveski v. ITT Educ. Servs., Inc.*, 719 F.3d 818,

828 (7th Cir. 2013), but it is equally plausible that the Dietary Guidelines and School Meals

Report need only be the "starting point" for USDA's rulemaking and that the agency may

consider those sources among other factors, *see Hughes v. United States*, 138 S. Ct. 1765, 1770,

1775 (2018).

The legislative history of the relevant statutes does not provide any additional clarity as to

Congress' intentions regarding the appropriate relationship between the Dietary Guidelines and

USDA's nutrition standards. On one hand, Congress has amended the relevant statutes to remove

more specific language requiring USDA to promulgate regulations to bring the school meal

standards "into conformance with" the Dietary Guidelines; as the Court has described, the

relevant statutes now use the more general "based on" to refer to USDA's rulemaking duty,

suggesting that Congress' intention is to move away from strict alignment between the Dietary

Guidelines and meal standards. *See* Healthy Meals for Healthy Americans Act of 1994, Pub. L.

No. 103-448, § 112(c), 108 Stat. 4699 (1994); Healthy, Hunger-Free Kids Act of 2010, Pub. L.

No. 111-296, § 441(a), 124 Stat. 3183 (2010). Moreover, since the enactment of the 2012 Rule,

Congress has also enacted a series of appropriations riders that permit states to grant exemptions

to the one-hundred percent whole grain-rich requirement and it has delayed the compliance date for Sodium Target 1, *see* AR 80, 244, 943, 1833, suggesting that Congress never intended for strict alignment between the Dietary Guidelines and the school meal standards.

On the other hand, relevant Senate reports specifically explain that USDA is "to take action to encourage schools to offer foods that reflect consumption recommendations made by the Dietary Guidelines," S. Rep. No. 108-279, at 24–25 (2004), and that "considerable work remains to be done to improve children's diets and to bring Federally-subsidized meals in line with [the Dietary Guidelines]," S. Rep. No. 111-178, at 4–5 (2010), suggesting that Congress did have the specific consumption recommendations in mind in referring USDA to the Dietary Guidelines. In the end, however, "the statutory language 'neither plainly compel[s] nor clearly preclude[s] [an] interpretation,'" and so the Court must proceed to *Chevron*'s step two. *See Nat'l Elec. Mfrs. Ass'n*, 654 F.3d at 505.

At step two, the Court asks whether the "agency's [action] is based on a permissible construction of the statute." *Id.* The Court may overturn USDA's interpretation under *Chevron* step two only if the relevant statutes "unambiguously foreclosed the agency's statutory interpretation." *Catawba Cty., N.C. v. E.P.A.*, 571 F.3d 20, 35 (D.C. Cir. 2009). Thus, the Court will not "usurp an agency's interpretive authority by supplanting its construction with our own, so long as the interpretation is not 'arbitrary, capricious, or manifestly contrary to the statute.'" *Philip Morris USA, Inc. v. Vilsack,* 736 F.3d 284, 290 (4th Cir. 2013) (quoting *Chevron*, 467 U.S. at 844, 845). "A construction meets this standard if it 'represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute.'" *Id*. Courts have been clear that "[r]eview under this standard is highly deferential,

20

with a presumption in favor of finding the agency action valid." *Ohio Valley Envt'l Coal.*, 556

F.3d at 192.

Moreover, an agency's construction of its own regulations is entitled to "substantial

deference," *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994), and is accorded

"controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Id*. Broad

deference to an agency is especially appropriate where, as here, "a complex and highly technical

regulatory program" is concerned, requiring "significant expertise" and the "exercise of

judgment grounded in policy concerns." *Id*. (citing *Pauley v. BethEnergy Mines, Inc.*, 501 U.S.

680, 697 (1991)).

Here, given this "highly deferential" standard, the Court concludes that the Final Rule is a

reasonable interpretation of the relevant statutory language. As the Court has just explained, the

statutory language is ambiguous and could lead to several plausible interpretations. USDA

reasonably interpreted "consistent with the goals of" the Dietary Guidelines to be a broad,

deferential phrase that requires consistency with the ultimate objectives of Dietary Guidelines—

in this case, increasing whole-grain consumption and reducing sodium consumption—but also

provides USDA with flexibility to rely on its expertise to depart from the Dietary Guidelines'

specific consumption requirements. *See de Nobel v. Vitro Corp.*, 885 F.2d 1180, 1188 (4th Cir.

1989) (applying a deferential standard when determining whether ERISA "interpretation is

consistent with the 'goals of the plan'"); *Tackitt*, 758 F.2d at 1575. It also seems especially

reasonable for USDA to interpret "consistent *with the goals*" of the Dietary Guidelines as

meaningfully different from "consistent with" the Dietary Guidelines, an interpretation preferred

by Plaintiffs, and to interpret that difference to permit a looser connection between the Dietary

Guidelines and school meal standards. Moreover, the Final Rule is consistent with this

21

interpretation as it is does reflect the ultimate objective of increasing whole grain consumption and decreasing sodium consumption, even if it does not go as far as to contain the Guidelines' specific quantitative recommendations.

USDA similarly reasonably interpreted Congress' mandate that it promulgate rules "based on" the Dietary Guidelines and the School Meals Report to broadly require it to use these resources as the "starting point" for or "foundational part" of its rulemaking regarding the school meal standards. *See Hughes*, 138 S. Ct. at 1775 (using the Black's Law Dictionary definition of "base" and explaining that a criminal defendant's sentence is based on the Sentencing Guidelines if the judge uses the Guidelines as a starting point but then ultimately departs from them and explains the decision to deviate from the Guidelines).

The Final Rule reflects this interpretation because it used the recommendations in the Dietary Guidelines and the School Meals Report as a starting point, but then provided an explanation for its departure from the specific consumption requirements based on practical considerations. Regarding whole grains, it explained that the "whole grain-rich requirement in this final rule is a minimum standard, not a maximum, and reflects in a practical and feasible way the Dietary Guidelines' emphasis on whole grains consumption." AR 28. Regarding sodium, the Final Rule explains that USDA's "intention is to ensure that the sodium targets reflect the most current Dietary Guidelines for Americans …, are feasible for most schools, and allow them to plan appealing meals that encourage consumption and intake of key nutrients that are essential for children's growth and development." AR 30. Thus, the Final Rule shows that USDA used its expertise to balance the nutrition science in the Dietary Guidelines with the practical considerations of implementation.

Accordingly, the Court must defer to USDA's interpretation of the federal laws governing the school meals programs because it was a reasonable interpretation of laws it is tasked with implementing. *See Thomas Jefferson Univ.*, 512 U.S. at 512.

### ii.   Unexplained and Arbitrary Decisionmaking

Plaintiffs also contend that the Final Rule reflects unexplained and arbitrary decisionmaking because USDA improperly considered student taste preferences, operational flexibilities, and the role of product innovation, did not give sufficient consideration to nutrition science and student health, and failed to properly explain the basis for weakening nutrition standards nationwide.

An agency's final decision must show that it examined "the relevant data and articulate[d] a satisfactory explanation for its action including 'a rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). "Agency action is arbitrary and capricious if the agency relies on factors that Congress did not intend for it to consider, entirely ignores important aspects of the problem, explains its decisions in a manner contrary to the evidence before it, or reaches a decision that is so implausible that it cannot be ascribed to a difference in view." *Appalachian Voices v. State Water Control Bd.*, 912 F.3d 746, 753 (4th Cir. 2019) (quoting *Bedford Cty. Mem'l Hosp. v. Health & Human Servs.*, 769 F.2d 1017, 1022 (4th Cir. 1985)). "[R]eview under this standard is highly deferential, with a presumption in favor of finding the agency action valid." *Id.* (quoting *Ohio Valley Envtl. Coal*, 556 F.3d at 192). Where the agency "considered the relevant factors, weighed risks and benefits, and articulated a satisfactory explanation for [its] decision," the court cannot "substitute[] its judgment for that of the agency." *Dep't of Comm. v. New York*, 139 S. Ct. 2551, 2570 (2019).

23

Once again, given this "highly deferential" standard, the Court cannot conclude that the Final Rule demonstrates arbitrary decisionmaking. First, USDA was permitted to consider student taste preferences, operational flexibilities, and product innovation in formulating the Final Rule. Although USDA is certainly required to consider certain factors, including nutritional science and the Dietary Guidelines, in establishing standards for the school meal programs, *see, e.g.*, 42 U.S.C. §§ 1758(a)(1)(A), 1773(e)(1), this requirement does not exclude other factors from USDA's consideration. *See Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003) ("We do not read the enumeration of one case to exclude another unless it is fair to suppose that Congress considered the unnamed possibility and meant to say no to it."); *see also Otsuka Pharm. Co.*, 2015 WL 1962240, at *7 ("[Plaintiff] ignores the critical fact that [the relevant statutory provision] sets forth circumstances where FDA cannot *deny* approval for a labeling carve-out; it does not, as [plaintiff] contends, address situations where FDA can or cannot *grant* approval." (emphasis in original)). Had Congress wanted USDA to consider only student health and nutritional science in establishing the school meal standards to the exclusion of all other factors, it could easily have done so explicitly, and Plaintiffs do not cite to any part of the relevant statutory scheme that would convince the Court that it did. Thus, USDA's consideration of these other factors was not arbitrary and capricious.

Similarly, USDA did not come to an incorrect or inconsistent conclusion regarding the role of product innovation. Although there was certainly evidence in the record that retaining the 2012 Rule's higher standards for sodium and whole grains would incentivize product innovation within the food industry, *see* AR 4916 (public comment that maintaining the standards from the 2012 Rule would "justify continued public and private efforts to further the development of lower-sodium and whole grain-rich products"), there was also evidence that the food industry

was concerned about its ability to meet higher standards, especially given the uncertainty surrounding the Institute of Medicine's ongoing revisions of the DRIs and the forthcoming 2020 Dietary Guidelines, *see* AR 3538. Ultimately, USDA came to the conclusion "that regulatory certainty [was] essential to incentivize the food industry's efforts to support the service of wholesome and appealing school meals," AR 30, a sentiment that was reflected in the Final Rule. USDA explained that it did "not anticipate that [the Final Rule] w[ould] deter the significant progress made to date by State and local operators, USDA, and industry manufacturers to achieve healthy, palatable meals for students," because "[t]he certainty [the Final Rule] provides around the changes to the standards w[ould] provide industry the ability to commit to reformulating products and work towards innovative solutions." AR 31–32. This strikes the Court as a reasonably "satisfactory explanation" for USDA's consideration of product innovation, and thus it is entitled to a presumption of validity. *See State Farm*, 463 U.S. at 43; *Appalachian Voices*, 912 F.3d at 753.

The Court also finds that USDA did not improperly consider student taste preferences, operational flexibilities, and the role of product innovation at the expense of student heath and nutritional science, but instead balanced these considerations against each other. As to both whole grains and sodium, the Final Rule states "[t]he targeted flexibility [of the Final Rule] will improve student participation without a detrimental effect on the overall quality of the meals offered to children," AR 25, thus indicating USDA's view that it would be more successful in improving student health if it took the necessary steps to ensure that students actually consume the foods offered by SFAs.

With respect to the whole-grain requirement, USDA was "mindful" of "concerns about the health and dietary habits of children" and "agree[d] that schools should provide the healthiest

25

foods possible." AR 28. It ultimately concluded, however, that "[b]y reimplementing the whole grain-rich requirement that was in place from the SY 2013-2014," it balanced "the nutritional benefits of whole grains" against "the need for gradual adjustments in school menu planning, procurement, and food service equipment." *Id.* It also emphasized that the whole grain-rich requirement was a "floor and not a ceiling," and that USDA would continue to make whole grain-rich products easily available and provide training and technical assistance to assist in efforts to provide students with healthy whole grain food options. *Id.*

With respect to delaying Sodium Target 2 and eliminating the Final Sodium Target, USDA similarly weighed "the need for further sodium reduction" in student meals against USDA's need to ensure that it had the necessary time "to make any regulatory adjustments" based on the newly revised DRIs and forthcoming 2020 Dietary Guidelines, the need to "provide schools and the food industry the regulatory certainty they need to conduct food procurement and product reformulation activities, and "practical considerations" that had made sodium reduction challenging. AR 30. Ultimately, the Final Rule "balance[d] nutrition science, practical application of requirements, and the need to ensure that children receive wholesome and appealing meals." *Id.* Although USDA's weighing of student health and nutritional science did not result in Plaintiffs' desired outcome, it is clear that USDA "considered the relevant factors, weighed risks and benefits, and articulated a satisfactory explanation for [its] decision," and, even if the Court disagreed with how USDA weighed these factors or with its final result, it is not the Court's role to "substitute[] its judgment for that of the agency." *See Dep't of Comm.*, 39 S. Ct. at 2570. Thus, the Court concludes that USDA's analysis of the relevant factors did not constitute arbitrary and capricious decisionmaking.

Finally, the Court concludes that USDA's decision to implement lower nationwide standards, as opposed to continuing to grant exemptions to the higher standards in the 2012 Rule, was not arbitrary and capricious. Plaintiffs contend that USDA made no effort "to explain why nationwide, across-the-board rollbacks were necessary to respond to discrete issues that some schools had experienced with whole grains" when alternative approaches could have helped those schools without changing the standards in the 2012 Rule altogether. ECF No. 26 at 31; ECF No. 52 at 22–23. The Final Rule does explain, however, that almost a quarter of schools had asked for hardship exemptions from the whole-grain rich requirement for SY 2017–2018 and that continuing "to operate these nationwide programs in an ad hoc fashion, with recurrent exemptions," was "not feasible." AR 28. The Final Rule also made clear that it was "a minimum standard, not a maximum" AR 28, that "[p]rogram operators may exceed [the Final Rule's] minimum requirements," AR 31, and that USDA would "continue to provide training and technical assistance resources to assist" schools in increasing whole-grain content and decreasing sodium content in school meals, AR 28, 30. Although this is not the result that Plaintiffs would have preferred, USDA did not ignore the benefit of technical assistance and training and it did provide a "satisfactory explanation" for deciding to implement nationwide standards as opposed to operating the school meal programs on an ad hoc basis. Because the Court cannot "substitute[] its judgment for that of the agency," it cannot conclude that the Final Rule reflects arbitrary and capricious decisionmaking. *See Dep't of Comm.*, 139 S. Ct. at 2570.

### iii.   Unacknowledged and Unexplained Change in Position

Next, Plaintiffs contend that the Final Rule represents an unacknowledged and unexplained change in position because USDA previously interpreted federal law to require

close alignment between the Dietary Guidelines and the nutrition standards for school meals, and it did not adequately justify the Final Rule's change in position.

"An agency may not … depart from prior policy *sub silentio* or simply disregard rules that are still on the books." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). However, "[a]gencies are free to change their existing policies as long as they provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) (citing *Nat'l Cable & Telecomm. Ass'n v. Grand X Internet Servs.*, 545 U.S. 967, 981–82 (2005) and *Chevron*, 467 U.S. at 863–64). When an agency changes its existing position, it "need not always provide a more detailed justification than what would suffice for a new policy created on a blank slate." *Fox Television Stations, Inc.*, 556 U.S. at 515. But the agency must at least "display awareness that it is changing position" and "show that there are good reasons for the new policy." *Id.* Although the agency must provide a "reasoned explanation for its action," it "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates." *Id.* (emphasis in original).

Here, USDA certainly shifted its policy position between the 2012 Rule and the Final Rule in 2018. But whether this shift was the result of a different interpretation of the requirements of federal law or simply a new policy preference, and thus which type of change USDA was required to acknowledge, is a closer question. Both the 2012 Rule and the Final Rule indicate that the nutrition standards for school meals must "reflect" the latest Dietary Guidelines. *See* AR 30, 3041. Both also regularly refer to the Dietary Guidelines' overarching concerns with

increasing whole grain consumption and decreasing sodium consumption. *See* AR 28, 30, 3041, 3047, 3050. Thus, in that sense, the Rules' interpretation of federal law is consistent.

As Plaintiffs correctly point out, however, the 2012 Rule and earlier rules governing school meals referred more specifically to alignment between the Dietary Guidelines and nutrition standards for school meals and the Dietary Guidelines' specific quantitative recommendations. For example, the 2012 Rule stated that "[t]he 2005 and 2010 Dietary Guidelines provide more prescriptive and specific nutrition guidance than earlier releases and require significant changes to school meal requirements," AR 3060, 3093; a 2000 USDA rule stated that it required that "[s]chool lunches and breakfasts now must meet" specific consumption recommendations in the Dietary Guidelines, *National School Lunch Program and School Breakfast Program: Additional Menu Planning Approaches*, 65 Fed. Reg. 26904-01, 26904 (May 9, 2000); and a 1995 rule stated that its "foundation" was "the requirement that … school lunches and breakfasts comply with the recommendations of the Dietary Guidelines" and that "Congress mandated that school meals comply with Dietary Guidelines," *National School Lunch Program and School Breakfast Program: School Meals Initiative for Healthy Children*, 60 Fed. Reg. 31188-01, 31188, 31194 (June 13, 1995).[9]

It is not at all clear to the Court that language cited in the 2012 Rule and earlier rules related to that issue represents a legal interpretation of federal law, however. Nowhere in the earlier rules did USDA explicitly state that federal law required close alignment between the Dietary Guidelines and school nutrition standards, and any reference to such an alignment

---

[9] USDA contends that this shift can be explained away by a change in the statutory language—federal law originally required that school meals be consistent with the Dietary Guidelines and it now requires that they be consistent with the *goals of* the Dietary Guidelines. Although it is correct that the statutory language has changed, it changed in 1996. *See* Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. No. 104-193, § 702, 110 Stat. 2105 (1996). Thus, the change in statutory language cannot explain a change in position between 2012 and 2018 or why USDA held a seemingly consistent position between 1995 and 2012.

appeared to be describing the goal of the rule, rather than the goal of federal law. *See, e.g.*, 65 Fed. Reg. at 26904 (stating that the final 2000 rule itself required school meals to meet the specific requirements in the Dietary Guidelines). Thus, it seems that USDA was simply articulating a policy position—nutrition standards should be closely aligned with the specific recommendations in the Dietary Guidelines—that it subsequently modified in the Final Rule.

And in articulating the Final Rule's new requirements for whole grain-rich foods and sodium, USDA certainly acknowledged this shift in policy. *See* AR 22–24, 27–30. The question is, however, whether USDA offered a "reasoned explanation for the change." *See Encino Motorcars, LLC*, 136 S. Ct. at 2125; *Fox Television Stations, Inc.*, 556 U.S. at 515. With respect to the shift from the one-hundred percent to the fifty percent whole grain-rich requirement, USDA explained that nearly a quarter of SFAs continued to submit whole grain-rich exemption requests "based on hardship," AR 28; *see also* AR 33, and it determined that "it [was] not feasible to operate these nationwide programs in an ad hoc fashion, with recurrent exemptions, without giving operators and the food industry a workable regulatory solution that provides the long-term certainty they need for food procurement and product formulation," AR 33. USDA also explained that even though it was eliminating the one-hundred percent whole grain-rich requirement, the new fifty percent requirement was "a minimum standard, not a maximum, and reflects in a practical and feasible way the Dietary Guidelines' emphasis on whole grains consumption." AR 28. Thus, even though USDA did not specifically address its decision to depart from USDA's previous approach of aligning the standards with the "prescriptive and specific nutrition guidance" in the Dietary Guidelines, it did explain that it balanced practical operational concerns with student health needs in forming the altered whole grains standard. Even if the Court were to disagree with this new outcome, USDA was not required to convince

the Court that its "reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates." *See Fox Television Stations, Inc.*, 556 U.S. at 515. Thus, the Final Rule adequately explained its change in policy with respect to whole grains.

USDA's explanation was similarly adequate with respect to sodium. The Final Rule states that USDA's decision to delay implementation of Sodium Target 2 until SY 2024–2025 and eliminate the Final Sodium Target, which would have gone into effect in SY 2022–2023, was to provide schools "more time for gradual sodium reduction." AR 29. This additional time was necessary given the Institute of Medicine's ongoing review of the DRIs for sodium and the forthcoming 2020 Dietary Guidelines, USDA's need to have "the time necessary to make any regulatory adjustments based on the most current scientific recommendations," and the need for "regulatory certainty" for schools and the food industry. AR 30. The Final Rule also cited "practical reasons," such as the fact that "many schools are not equipped for scratch cooking, which makes further sodium reduction challenging," and explained that "a more flexible approach to sodium reduction allows more time for product reformulation, school menu adjustments, food service changes, personnel training, and changes in student preferences." *Id.* The Final Rule also expressed concern that keeping the Sodium Target 2 "could potentially lower the acceptance of meals with lower sodium content by students, who are currently accustomed to eating foods with higher sodium content outside of school. This could negatively impact program participation and contribute to food waste." *Id.*

With respect to USDA's decision to eliminate the Final Sodium Target, this explanation strikes the Court as reasonable. The Final Sodium Target was not intended to take effect until SY

31

2022–2023, so it is likely it would have had to be reconsidered in light of the forthcoming 2020 Dietary Guidelines. Although eliminating the Final Sodium Target altogether may not have been the best or only way to handle the forthcoming 2020 Dietary Guidelines, USDA clearly believed it was better for regulatory purposes to wait until after the new Guidelines and DRIs were released to set any final targets for sodium content, and it is not for the Court to second-guess that decision. *See Fox Television Stations, Inc.*, 556 U.S. at 515. With respect to its decision to delay Sodium Target 2, USDA augmented its explanation with practical concerns, such as student taste preferences, operational difficulties, and product innovation. Although Plaintiffs may disagree, the Court has already explained that these were proper factors to consider and finds that they adequately explain USDA's shift in policy. Accordingly, the Court concludes that the Final Rule does not represent an unacknowledged and unexplained change in policy position.[10]

### iv.   Response to Comments

Finally, Plaintiffs contend that USDA failed to respond to comments regarding the health effects that would result from delaying or weakening nutrition standards, the disproportionate impact the Interim Final Rule would have on low-income and minority children, and alternatives to rolling back the nutrition standards, as well as comments questioning USDA's assertion that schools and the industry needed additional time to comply and develop appropriate food products.

---

[10] In their opening brief, Plaintiffs also contend that USDA failed to consider Plaintiff Center for Science in the Public Interest's reliance interests before modifying the 2012 Rule. Although it is true that an agency must provide a more detailed description "[w]hen its prior policy has engendered serious reliance interests that must be taken into account," *see Fox Television Stations, Inc.*, 556 U.S. at 515, this doctrine generally only applies to reliance interests of regulated parties, *see Encino Motorcars, LLC*, 136 S. Ct. at 2126; *MetLife, Inc. v. Fin. Stability Oversight Council*, 177 F. Supp. 3d 219, 239 n.18 (D.D.C. 2016). Plaintiffs do not contend that Center for Science in the Public Interest is regulated by the Final Rule, and seem to passively acknowledge that this argument lacks merit because they did not continue to press it in their reply.

"An agency must consider and respond to significant comments received during the period for public comment." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015). "[T]he agency's response to public comments need only 'enable [the reviewing court] to see what major issues of policy were ventilated … and why the agency reacted to them as it did.'" *Pub. Citizen, Inc. v. F.A.A.*, 988 F.2d 186, 197 (D.C. Cir. 1993) (quoting *Auto. Parts & Accessories Ass'n v. Boyd*, 407 F.2d 330, 338 (D.C. Cir. 1968)). Although "conclusory" responses are insufficient to meet this standard, *see Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 626 F.3d 84, 94 (D.C. Cir. 2010), an agency's obligation "is not particularly demanding," *Ass'n of Private Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 441 (D.C. Cir. 2012) (internal quotation marks omitted).

Here, given that this standard "is not particularly demanding," USDA appropriately responded to significant comments. *See id.* With respect to the potential harms to student health from delaying or weakening the nutrition standards, the Final Rule states that USDA is "mindful" of the concerns, but the whole-grain rich requirement is "a minimum standard, not a maximum, and reflects in a practical and feasible way the Dietary Guidelines' emphasis on whole grains consumption." AR 28. As for sodium, USDA balanced the "concern that the sodium flexibility will lead to negative health effects in children," AR 29, against the need "to ensure that the sodium targets reflect the most current Dietary Guidelines for Americans and DRIs, are feasible for most schools, and allow them to plan appealing meals that encourage consumption and intake of key nutrients that are essential for children's growth and development," AR 30. Although Plaintiffs may disagree with how USDA balanced these considerations, the analysis is not conclusory and sufficiently demonstrates that the agency considered a variety of factors in coming to the conclusion that it did. *See Pub. Citizen, Inc.*, 988

F.2d at 197. It therefore appropriately responded to comments regarding the effect of the Final Rule on student health.

As for comments regarding the disproportionate impact on low-income and minority students, USDA concluded that the Final Rule "is not expected to limit or reduce the ability of protected classes of individuals to participate in the [NSLP and SBP] … or have a disproportionate adverse impact on the protected classes," and it made its full analysis available in a Civil Rights Impact Analysis. AR 35; *see also* AR 3172–85. Although Plaintiffs may disagree with the results of the Civil Rights Impact Analysis, the Court is satisfied that the Analysis identifies the relevant issues of concern and USDA's reaction to them, even if it may have done so in a less than exhaustive or persuasive manner. *See Pub. Citizen, Inc.*, 988 F.2d at 197. USDA therefore sufficiently responded to commenters' civil rights concerns.

USDA also adequately considered the alternative approaches suggested by the public comments, including training, technical assistance, sharing of best practices, taste tests, and adjusted recipes. The Final Rule explains that "USDA will continue to provide training and technical assistance to assist" in efforts "to incorporate whole grain-rich products in the school menu," but it also emphasized that it was no longer "feasible" to operate the school meal programs "in an ad hoc fashion" by granting hardship exemptions to certain SFAs. AR 28. With respect to sodium, it explained that a more gradual timeline was necessary in order to "provide[] flexibility to address sodium challenges" and "address commenters' concerns regarding student acceptability and consumption of meals with lower sodium content, food service operational issues, food industry's formulation and innovation challenges, and the important goal to safeguard the health of millions of school children." AR 30. Thus, even though USDA did not explicitly address each individual alternative provided by the commenters, it did imply that any

34

tactic short of implementing consistent nationwide standards would be insufficient for addressing practical concerns with the previous whole grain and sodium standards. *See Am. Iron & Steel Inst. v. EPA*, 115 F.3d 979, 1005 (D.C. Cir. 1997) (affirming agency's response to comment even though "[t]he agency did not explicitly explain why it did not accept [the proposed alternative]"). USDA therefore adequately responded to comments concerning alternative approaches.

Finally, USDA adequately responded to comments questioning its assertion that SFAs and the food industry needed additional time to comply with the standards in the 2012 Rule. Although there was certainly evidence in the record that additional time was unnecessary, *see* AR 4916, there was also evidence that it was, particularly given the number of whole grain hardship exemptions that had been requested, AR 28, 3227–28, and comments from state agencies and manufacturers that more time was necessary to implement the timeline for gradual sodium reduction, AR 29–30. Even if the Court were to disagree with USDA's balancing of this evidence, the agency's response allows the Court "to see what major issues of policy were ventilated … and why the agency reacted to them as they did.'" *See Pub. Citizen, Inc.*, 988 F.2d at 197. It therefore met its burden. Accordingly, the Court concludes that USDA adequately responded to significant comments in the record and the Final Rule need not be remanded on this basis.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs' Cross-Motion for Summary Judgment is granted, and Defendants' Cross-Motion for Summary Judgment is denied. The Final Rule is vacated and remanded to USDA for further proceedings consistent with this opinion. A separate Order shall issue.


Date: April    13, 2020                                    /s/_____
                                                          GEORGE J. HAZEL
                                                          United States District Judge